40 P.3d 1221 (2002)
HARRISON MEMORIAL HOSPITAL, Appellant,
v.
Ann B. GAGNON, Respondent.
No. 26601-6-II.
Court of Appeals of Washington, Division 2.
March 1, 2002.
*1222 Elizabeth K. Reeve, Reeve Shima, Seattle, Counsel for Appellant.
Benjamin Riverbed Sligar, Law Office of Gregory F. Logue, Tacoma, Counsel for Respondent.
John R. Wasberg, Dept. of Labor & Industries, Seattle, Counsel for other party Dept. of Labor & Industries.
MORGAN, J.
The main question in this worker's compensation case is who has the burden of persuasion in the superior court. Under RCW 51.52.115, that burden rests on whoever is attacking the findings and decision of the Board of Industrial Insurance Appeals. The superior court so held, and thus we affirm.
Hepatitis C is a disease that infects the liver. It is caused by a "virus or blood borne pathogens."[1] It is diagnosed by testing the blood for elevated liver enzymes and antibodies to the Hepatitis C virus. Unless blood tests are done, it "may take twenty years" to manifest itself.[2] Its incubation period is "about six to eight weeks, after which ... sometimes the liver enzymes may start to rise."[3] It can be transmitted when an uninfected person internalizes the blood of an infected person, as, for example, by having sex without a condom; by ingesting a substance into the nose through a device previously used by an infected person; or by puncturing one's skin with a needle previously used by an infected person. Risk factors include using illicit drugs, obtaining tattoos, and piercing body parts.
Since January 1990, Gagnon has been "clean and sober[.]"[4] Before 1990, she frequently snorted cocaine into her nose through "a straw or other device" that she often "shared ... with other [users] of cocaine."[5] There is no evidence that she used a needle to inject cocaine or other illicit drugs. She has not been monogamous, and she rarely has required her partner to wear a condom. She has four tattoos, and her ears have been pierced in five locations.
From 1985 to 1991, Gagnon was in the Navy. According to the superior court's findings, "[t]he work required her to perform Emergency Medical Technician duties aboard an ambulance, to administer immunizations, to handle bloody surgical instruments, and to clean operating rooms of substances that included blood."[6] She did not wear protective clothing because the Navy did not require it. She does not recall being stuck with a needle while in the Navy,[7] but a co-worker at Harrison recalls her saying that she once was.[8] When she left the Navy, her liver enzymes were "within normal limits."[9]
In November 1990, Gagnon was hired as an operating room technician at Harrison. According to the superior court's later findings, this employment "required her to work directly with surgeons during surgical procedures[,]" "to handle bloody instruments[,]" and "to clean substances that included blood."[10] She generally wore protective clothing, which the hospital required. She formally reported four incidents of exposure to other persons' blood,[11] but her physician, Dr. Robert Caulkins (who coincidentally is on the staff at Harrison), thought that her exposure was undoubtedly much greater. He later testified:

*1223 The exposure that Ann Gagnon has had as a tech I can assure you exceeds more than a few exposures, whether she knows it or not. The exposures happen very frequently and on a weekly basis. She's getting blood on her hands through broken gloves, which happens probably multiple times a week which would never be documented. She is getting bone dust in her eyes whether she knows it or not, which goes undocumented. She is getting blood splatters in her eyes, which goes undocumented, unless it's very substantial, which never gets document[ed]. She might have even had superficial pokes to her hands that she might not even be aware of that go undocumented[.][[12]]
Dr. Caulkins became Gagnon's physician in December 1992. He periodically tested her liver enzymes,[13] which were "negative" until 1997. In 1997, she was diagnosed with Hepatitis C, and a later test showed that her liver enzymes were elevated.[14]
On September 5, 1997, Gagnon's liver was biopsied by Dr. Yuen San Yee, a specialist in intestinal and liver disorders.[15] Although a biopsy "does not date the time of exposure," the presence of "fibrosis or significant scarring" indicates "that the disease has been there for a long time."[16] The converse does not always follow, for the disease "can be there for a long time without a person ever developing fibrosis or scarring[.]"[17] Gagnon's biopsy did not show "fibrosis or cirrhosis."[18]
On March 9, 1998, Gagnon filed a worker's compensation claim. She alleged that she had acquired Hepatitis C from the "multiple exposures to blood she [had] encountered at Harrison."[19] The Department of Labor and Industries (DLI) allowed the claim.
On April 9, 1998, Harrison appealed to the Board of Industrial Insurance Appeals (the Board).[20] The Board appointed a hearing examiner who then viewed and listened to the witnesses, including three physicians. Dr. Caulkins said in effect that Gagnon probably had acquired Hepatitis C from her work at Harrison;[21] Dr. Yee said in effect that he could not tell how Gagnon had acquired Hepatitis C;[22] and Dr. Hartwell said in effect that Gagnon probably had not acquired Hepatitis C from her work at Harrison.[23]
On September 8, 1999, the examiner proposed a decision and order affirming DLI.[24] Essentially then, the examiner ruled against Harrison and for Gagnon.
Harrison appealed to the Board,[25] but the Board adopted the examiner's recommendations.[26] Harrison next appealed to the superior court,[27] which held a bench trial based on the record made before the examiner.[28] When the trial ended, the court held (1) that Harrison had the burden of persuasion and (2) that Harrison had not met its burden of persuasion. The court reasoned:
3.2 The determination of the cause of Ms. Gagnon's disease is a question of fact.
3.3 If the evidence as to a factual issue is evenly balanced, the finding of the
*1224 Board of Industrial Insurance Appeals as to that issue must stand: But, if the evidence produced by the party attacking the finding preponderates in any degree, then the findings should be set aside.
3.4 Harrison Memorial Hospital is the party challenging the Board's decision and has the burden to establish its case by a preponderance of the evidence.
3.5 Harrison Memorial Hospital successfully challenged some of the factual conclusions affirmed by the Board, but these successful challenges only brought the evidence to an even balance. Had Harrison presented these challenges to the Department of Labor and Industries when the burden of proof was upon Ms. Gagnon, the determination may have been different. However, because the evidence presented to the court is equally balanced, Harrison Memorial Hospital has failed to carry their burden of proof.[29]
Interestingly and perhaps not consistently, the superior court also found that Gagnon "was more probably than not infected with the Hepatitis C virus as a proximate result of her work activities at Harrison ... than as the proximate result of any of her other activities that created an increased risk of contraction of the virus."[30] The superior court affirmed the Board, and Harrison filed this appeal.
RCW 51.52.115 is the key statute. It provides in part that "the findings and decision of the board shall be prima facie correct and the burden of proof shall be upon the party attacking the same."
According to the cases, one way an appellant can attack the board's findings is by showing, usually though not always by motion for summary judgment,[31] that the evidence in the record made before the Board[32] is insufficient to support one or more of the Board's essential findings.[33] In Olympia Brewing Co. v. DLI,[34] for example, a husband died at work. His widow claimed a pension but did not produce any evidence showing cause of death. DLI and the Board's predecessor granted her a pension anyway. The Supreme Court held "that one sustains the burden of proving that a decision of the [Board's predecessor] is erroneous when one demonstrates that there is not sufficient evidence to support it;"[35] that the employer had sustained that burden by showing that the widow had not produced any evidence before the board's predecessor; and thus that the employer was entitled to prevail.
Another way in which the appellant can attack the board's findings is by demonstrating to a trier of fact, at trial in superior court, that the evidence preponderates against those findings. As one court recently said:

*1225 The Board's decision is prima facie correct under RCW 51.52.115, and a party attacking the decision must support its challenge by a preponderance of the evidence. Ravsten v. Department of Labor & Indus., 108 Wash.2d 143, 146, 736 P.2d 265 (1987). On review, the superior court may substitute its own findings and decision for the Board's only if it finds "`from a fair preponderance of credible evidence', that the Board's findings and decision are incorrect." McClelland v. ITT Rayonier, Inc., 65 Wash.App. 386, 390, 828 P.2d 1138 (1992) (quoting Weatherspoon v. Department of Labor & Indus., 55 Wash.[App.] 439, 440, 777 P.2d 1084 (1989)).[[36]]
Olympia Brewing,[37] numerous other cases,[38] and Washington's Pattern Instructions (WPI) are all in accord.[39]
Against this backdrop, Harrison advances three arguments. First, it argues that the record made before the Board does not contain evidence sufficient to support a finding that Gagnon contracted Hepatitis C in the course of her employment at Harrison. Second, it argues that it should not have been required to bear the burden of persuasion. Third, it argues that even if it had the burden of persuasion, this court should find that the evidence is not evenly balanced, but instead preponderates against the Board's findings.

I.
The question underlying the first argument is whether a rational trier of fact could find, on a more-probable-than-not basis, that Gagnon contracted Hepatitis C while working at Harrison. Viewed in the light most favorable to Gagnon,[40] the evidence shows that her liver enzymes were within normal limits when she left the Navy. She was "clean and sober" at that time. She worked at Harrison over the next six years, and was exposed to Hepatitis C many times. At the end of that period, at least one test showed that her liver enzymes were elevated, and her liver biopsy was consistent with recent acquisition of the disease. Of the three physicians who testified, Dr. Caulkins was most familiar with both her and Harrison, and he thought she probably had acquired the disease at Harrison. This evidence supports a reasonable inference, and a rational trier of fact could find on a more-probable-than-not *1226 basis, that Gagnon acquired Hepatitis C while working at Harrison.[41]

II.
The question underlying the second argument is whether the claimant has the burden of persuasion in superior court. As already seen, RCW 51.52.115 and the applicable cases plainly allocate the burden of persuasion in superior court to whoever is attacking the findings and decision of the board. That person can be either the claimant or the employer. Here, that person was the employer, not the claimant, and the superior court did not err by so ruling.
Harrison relies heavily on Olympia Brewing. As already seen, that case held that a claimant cannot prevail if he or she produces no evidence that the injury or death was work-related. In alternative terms, the case held that the claimant had a burden of production which the claimant had not met.[42] The case did not hold that a claimant has the burden of persuasion in superior court. Indeed, it comments to the contrary, albeit in dictum, when it says that the "statutory declaration" presently found in RCW 51.52.115 "means that, if the evidence is evenly balanced, the finding of the department on that issue must stand."[43]
Harrison emphasizes Olympia Brewing's statement "that whenever a claimant's right to the benefits of the act is challenged at the joint board level, either by the department or by the employer, the ultimate burden is on the claimant to establish his or her right to those benefits."[44] Harrison also highlights several Board cases to the same effect. These authorities discuss the burden of persuasion before the Board, not the burden of persuasion before the superior court. Hence, none of them applies here.

III.
The question underlying Harrison's third argument is whether an intermediate appellate court should re-apply the burden of persuasion by weighing and balancing the competing testimony and inferences in the same way as the superior court. Our function is to review for sufficient or substantial evidence,[45] taking the record in the light most favorable to the party who prevailed in superior court. We are not to re-weigh or re-balance the competing testimony and inferences, or to apply anew the burden of persuasion, for doing that would abridge the right to trial by jury.[46] Having already held that the record contains sufficient evidence, we decline to disturb the superior court's finding that the evidence is evenly balanced. Accordingly, we affirm the superior court's conclusion that Harrison did not bear its burden of persuasion.
Affirmed.
I concur: HOUGHTON, J.
SEINFELD, J., concurring.
I agree with the majority's burden of proof analysis and conclusion. Nonetheless, I *1227 write separately to clarify the record, as I understand it, regarding the evidence of a change in Ann Gagnon's health after she left the Navy in 1991. The majority states at page 1222: "When she left the Navy, her liver enzymes were `within normal limits.'" Further on page 1223, it states that Dr. Robert Caulkins "periodically tested her liver enzymes, which were `negative' until 1997." (Footnote omitted.) The majority then writes that after Gagnon was diagnosed with Hepatitis C in 1997, "a later test showed that her liver enzymes were elevated." Page 1223. In footnote 14, the majority explains that the later test "is called an ALT (`alanine aminotransferase serum')" and that a second test, "called an AST (`aspartate aminotransferase serum')," was within normal limits.
The negative implication from this evidence is that the enzyme tests provide objective support for a finding that Gagnon acquired Hepatitis C during the time she was working at Harrison Memorial Hospital. But other facts not present in the majority opinion show that the objective evidence does not support this conclusion.
A careful review of the record shows the following: When Gagnon left the Navy in 1991, her liver enzymes tested "within normal limits" on the AST test. After Gagnon was diagnosed with hepatitis C in September 1997, her liver enzymes still tested "within normal limits" on the AST test. But Gagnon was also given a new test, the ALT, and for the first time there was evidence of a bump in her enzyme level.
Because the AST test never showed an elevated level, even after Gagnon clearly had contracted Hepatitis C and had elevated levels on the ALT, it is clear that the AST results were not helpful in determining Gagnon's enzyme levels. Consequently, the 1991 so-called normal liver enzyme reading and the normal readings in the subsequent years on Dr. Caulkins's tests are meaningless. When Gagnon left the Navy, her liver enzymes may or may not have been within normal limits. We simply have no meaningful evidence that supports a conclusion either way.
Further, while I respect the majority's attempt to protect Gagnon's reputation, the under statement that she "was not monogamous" significantly minimizes the extent of her exposure to risk before coming to Harrison. The record indicates between 25 to 50 unprotected sexual encounters in the 1980s, each of which allowed for the transmission of infected blood from her partner.
An accurate view of the record is important to our review of Harrison's contention that even if it had the burden of persuasion, we should find that the evidence is not evenly balanced but instead preponderates against the Board of Industrial Insurance Appeals findings. I believe that this is a very close question and turns solely on Dr. Caulkins' testimony.
As the majority explains, it is not our role to weigh and balance "the competing testimony and inferences in the same way as the superior court." Page 1226. Instead, we view the record "in the light most favorable to the party who prevailed in superior court." Page 1226. The record here shows that Dr. Caulkins was the witness most familiar with the case and he opined that Gagnon "probably had acquired the disease at Harrison." Page 1225. Based on this testimony, a rational trier of fact could find it slightly more probable than not that Gagnon contracted Hepatitis C while working at Harrison. In doing so, the trier of fact, could and would need to reject the testimony of Dr. Yuen San Yee, who said it is not possible to determine where Gagnon acquired the disease, and of Dr. Peter Hartwell, who testified that Gagnon probably did not acquire the disease at Harrison.
Because I agree with the majority's burden of proof analysis and with its conclusion that the trial court could reasonably find the evidence to be evenly balanced, I agree that Harrison failed to carry its burden of proof and, thus, that the superior court properly affirmed the Board.
NOTES
[1] Admin. R. (Caulkins) at 44.
[2] Admin. R. (Yee) at 21.
[3] Admin. R. (Yee) at 12.
[4] Admin. R. at 76, see also Clerk's Papers (CP) at 87.
[5] CP at 86.
[6] CP at 87.
[7] Admin. R. (Gagnon) at 30.
[8] Admin. R. (Yaptinchay) at 103.
[9] Admin. R. (Gagnon) at 51.
[10] CP at 87.
[11] Three of those persons tested negative for Hepatitis C. A fourth died before being tested, but his widow tested negative.
[12] Admin. R. (Caulkins) at 47.
[13] Admin. R. (Caulkins) at 54.
[14] This test is called an ALT ("alanine aminotransferase serum") test. A second test, called an AST ("aspartate aminotransferase serum") test, was within normal limits.
[15] Yee had treated Gagnon for a while in 1994, then not again until 1997. Admin. R. (Yee) at 10.
[16] Admin. R. (Yee) at 45.
[17] Admin. R. (Yee) at 45.
[18] Admin. R. (Yee) at 56.
[19] Admin. R. at 79. We omit a previous claim filed by Gagnon. It is not material here.
[20] See RCW 51.52.050.
[21] Admin. R. (Caulkins) at 55.
[22] Admin. R. (Yee) at 21-23.
[23] Admin. R. (Hartwell) at 9-11.
[24] See RCW 51.52.102-104; Admin. R. at 75-85.
[25] See RCW 51.52.104.
[26] See RCW 51.52.106.
[27] See RCW 51.52.110.
[28] See RCW 51.52.115.
[29] CP at 88.
[30] CP at 88 (Finding of Fact 2.13).
[31] See CR 56; RCW 51.52.140. Such a motion questions, before trial, the sufficiency of the evidence before trial. Other motions (e.g., motion to dismiss for lack of "prima facie" evidence, motion for directed verdict, motion for judgment n.o.v.) raise the same question during or after trial. In re Dependency of C.B., 61 Wash.App. 280, 282, 810 P.2d 518 (1991); Whitchurch v. McBride, 63 Wash.App. 272, 274-75, 818 P.2d 622 (1991), review denied, 118 Wash.2d 1029, 828 P.2d 564 (1992); see also 1 CLIFFORD S. FISHMAN, JONES ON EVIDENCE § 3:6 at 234-35 (7th ed.1992).
[32] See RCW 51.52.115 (superior court "shall not receive evidence or testimony other than, or in addition to, that offered before the board or included in the record filed by the board in the superior court").
[33] See, e.g., Scott Paper Co. v. Dep't of Lab. & Indus., 73 Wash.2d 840, 843, 440 P.2d 818 (1968) (quoting Sayler v. Dep't of Lab. & Indus., 69 Wash.2d 893, 896, 421 P.2d 362 (1966)); Allison v. Dep't of Lab. & Indus., 66 Wash.2d 263, 268, 401 P.2d 982 (1965); Inland Foundry Co., Inc., v. Dep't of Lab. & Indus., 106 Wash. App. 333, 339-40, 24 P.3d 424 (2001).
[34] Olympia Brewing Co. v. Dep't of Lab. & Indus., 34 Wash.2d 498, 208 P.2d 1181 (1949); Ehman v. Dep't of Lab. & Indus., 33 Wash.2d 584, 597, 206 P.2d 787 (1949).
[35] Olympia Brewing, 34 Wash.2d at 504, 208 P.2d 1181.
[36] McDonald v. Dep't. of Lab. & Indus., 104 Wash.App. 617, 621-22, 17 P.3d 1195 (2001).
[37] Olympia Brewing, 34 Wash.2d at 504, 208 P.2d 1181 ("if the evidence is evenly balanced, the finding of the department ... must stand").
[38] E.g., Ravsten, 108 Wash.2d at 143, 736 P.2d 265; Blue Chelan, Inc. v. Dep't of Lab. & Indus., 101 Wash.2d 512, 518, 681 P.2d 233 (1984) (sole fact-finding function in court review of board order is to examine evidence and determine whether or not it clearly preponderates against board's findings); Lang v. Dep't of Lab. & Indus., 35 Wash.App. 259, 263, 665 P.2d 1386 (1983) (Board decision upheld because claimant failed to meet burden of showing evidence preponderated against Board's finding); Scott Paper, 73 Wash.2d at 843, 440 P.2d 818 (burden is on party attacking findings and decision of Board to establish incorrectness by preponderance of the evidence); Chalmers v. Dep't of Lab. & Indus., 72 Wash.2d 595, 603, 434 P.2d 720 (1967) (findings and decision of board are correct until trier of fact finds from fair preponderance of evidence that such findings and decision are incorrect) (citing Allison, 66 Wash.2d at 268, 401 P.2d 982); La Vera v. Dep't of Lab. & Indus., 45 Wash.2d 413, 415, 275 P.2d 426 (1954); Goehring v. Dep't of Lab. & Indus., 40 Wash.2d 701, 707, 246 P.2d 462 (1952); Ferguson v. Dep't of Lab. & Indus., 197 Wash. 524, 531, 85 P.2d 1072 (1938); Eklund v. Dep't of Lab. & Indus., 187 Wash. 65, 66-67, 59 P.2d 1109 (1936); Grub v. Dep't of Lab. & Indus., 175 Wash. 70, 72, 26 P.2d 1039 (1933); McArthur v. Dep't of Lab. & Indus., 173 Wash. 701, 702, 23 P.2d 417 (1933); Knipple v. Dep't of Lab. & Indus., 149 Wash. 594, 600, 271 P. 880 (1928); McDonald, 104 Wash.App. at 622, 17 P.3d 1195; Stelter v. Dep't of Lab. & Indus., 107 Wash.App. 477, 480, 27 P.3d 650 (2001); Frazier v. Dep't of Lab. & Indus., 101 Wash.App. 411, 419, 3 P.3d 221 (2000); Ruse v. Dep't of Lab. & Indus., 138 Wash.2d 1, 5, 977 P.2d 570 (1999); Jenkins v. Dep't of Lab. & Indus., 85 Wash.App. 7, 12, 931 P.2d 907 (1996); Belnap v. Boeing Co., 64 Wash.App. 212, 217, 823 P.2d 528 (1992).
[39] WPI 155.03 tells the jury that "[t]he findings and decision of the Board ... are presumed correct[,]" and that "[t]he burden of proof is on [the appealing party] to establish by a preponderance of the evidence that the decision is incorrect."
[40] Haubry v. Snow, 106 Wash.App. 666, 669-70, 31 P.3d 1186 (2001); Henson v. Crisp, 88 Wash. App. 957, 960, 946 P.2d 1252 (1997), review denied, 135 Wash.2d 1010, 960 P.2d 937 (1998); Allen v. Dep't of Lab. & Indus., 30 Wash.App. 693, 695-96, 638 P.2d 104 (1981).
[41] See Sacred Heart Med. Ctr. v. Dep't of Lab. & Indus., 92 Wash.2d 631, 637, 600 P.2d 1015 (1979).
[42] We do not address whether this holding is still the law. The 1975 legislature amended RCW 51.52.050 to provide that "[i]n an appeal before the board, the appellant shall have the burden of proceeding with the evidence to establish a prima facie case for the relief sought in such appeal."
[43] Olympia Brewing, 34 Wash.2d at 504, 208 P.2d 1181.
[44] Olympia Brewing, 34 Wash.2d at 507, 208 P.2d 1181; Br. of Appellant at 18.
[45] Scott R. Sonners, Inc. v. Dep't of Lab. & Indus., 101 Wash.App. 350, 353, 3 P.3d 756, review denied, 142 Wash.2d 1008, 16 P.3d 1266 (2000); Garrett Freightlines, Inc. v. Dep't of Lab. & Indus., 45 Wash.App. 335, 340, 725 P.2d 463 (1986).
[46] Benedict v. Dep't of Lab. & Indus., 63 Wash.2d 12, 16, 385 P.2d 380 (1963) (appellate court has no right to substitute its judgment for that of trial court); see also Du Pont v. Dep't of Lab. & Indus., 46 Wash.App. 471, 479, 730 P.2d 1345 (1986) (appellate court cannot substitute its judgment for that of the trial court); Ritzschke v. Dep't of Lab. & Indus., 76 Wash.2d 29, 31, 454 P.2d 850 (1969) (where findings are supported by record, appellate court will not substitute its judgment for that of trial court); Scott Paper Co., 73 Wash.2d at 844, 440 P.2d 818 (appellate court tests "for sufficiency of probative evidence to support findings of fact").